## DAUBENDICK v. UNITED STATES.
### No. 47503.

United States Court of Claims.
March 6, 1950.

Caesar L. Aiello, Washington, D.C., Richard H. Mayfield and McKenney, Flannery & Craighill, on the brief, for plaintiff.

William H. Veeder, Washington, D. C., H. G. Morison, Asst. Atty. Gen., Washington, D. C., William A. Stern, II, Washington, D. C., on the brief, for defendant.

Before JONES, Chief Judge, and MADDEN, WHITAKER, HOWELL and LITTLETON, Judges.

MADDEN, Judge.

The plaintiff, an individual doing business as Dix Machine Works, operated a machine shop in Los Angeles, California. He and one Dee formed a partnership in June 1944 to act as a broker in the obtaining of business for the plaintiff's shop, This partnership, known as Dix & Dee, obtained from Lights, Incorporated, which had a prime contract with the Government, a subcontract for the machine work of certain parts for fuses, Lights to furnish the materials. The subcontract was made on June 20, 1944, and called for the machining of some 900,000 units by December 15, 1944. The partnership, in turn, subcontracted the work to the plaintiff. The Government made numerous changes in the specifications for the work, which changes required the plaintiff to obtain additional equipment in order to do the work. As a result of the changes the plaintiff fell far behind in his delivery schedule, which was not changed. By January 27, 1945, the plaintiff had delivered only 54,000 units.

About January 23, 1945, an agent of the Government expressed some concern about the brokerage feature of the transaction which entitled Dee to a large share of the profits of the plaintiff's work, and the Reconstruction Finance Corporation, which had made a loan to the plaintiff to finance the work, told the plaintiff that Dee would have to be eliminated from the arrangement. On January 27, the plaintiff and representatives of the Government and of Lights held a conference in which it was agreed that Light's subcontract to Dix & Dee would be cancelled and one or more new subcontracts would be given, for substantially the same units of works, by Lights directly to the plaintiff. The new arrangement between Lights and the plaintiff was worked out in considerable detail. What was agreed to be expressed in it was influenced somewhat by the fact that all the conferees wanted to leave no opening whereby Dee could assert a claim against Lights. All agreed that, though there was to be, in form, a cancellation of the subcontract to Dix & Dee, the arrangement would, in fact, be a continuation of the plaintiff's job of machining the units for Lights and the Government. The plaintiff had, of course, a considerable investment in his preparation to perform the work, and wanted to be sure that he would have a chance to amor-

tize that investment by doing the work and being paid for it. The plaintiff was told by the Government agents that if the contract was terminated before the work was done and paid for, his former contract and his new one would be treated as one contract for settlement purposes.

. Following this January 27 conference, Lights submitted to the plaintiff on February 6, 1945, a somewhat lengthy though informal memorandum of what had been agreed to. This was in the form of a proposal, and said that it would be reduced to more formal terms if agreed to. The plaintiff accepted the proposal, but it was never rewritten in more formal terms. This proposal made no mention of the question of whether starting costs incurred by the plaintiff under the former contract should be reimbursed in case of termination of the new contract.

The plaintiff was given two subcontracts by Lights under the new arrangement. He performed the new subcontracts efficiently, but on May 18, 1945, the unfinished part of one of the subcontracts, consisting of some 380,000 units, was terminated by Lights by direction of the Government. The plaintiff filed a settlement proposal with Lights in the amount of $70,046.93 as a claim under its former sub-subcontract with the Government through Lights and Dix & Dee, and its later subcontracts through Lights. The Government thereupon, pursuant to Section 7 (d) of the Contract Settlement Act, 41 U.S.C.A. § 107 (d) agreed to settle the plaintiff's claim directly with him. The plaintiff and the Government were unable to agree upon a settlement, whereupon the Contracting Officer awarded the plaintiff $2,168.11 on his claim. In arriving at this amount the Contracting Officer eliminated all the expense which the plaintiff had incurred in preparing to do the work under its earlier sub-subcontract, and considered only the expense incurred after the new subcontracts were awarded the plaintiff on January 27, 1945. It is agreed by the parties that if the former costs had been included, the principal amount due the plaintiff would have been $49,880.05.

The plaintiff appealed from the decision of the Contracting Officer to the Appeal Board of the Office of Contract Settlement. That Board affirmed the decision of the Contracting Officer. The closing paragraph of the written opinion of the Board is as follows: "We reach this result with great reluctance. Appellant was unquestionably led to believe in good faith that his starting costs incurred under his second-tier subcontract with the partnership would be allowed in the event of the termination of his twin subcontracts with the prime contractor. Unfortunately, the papers were so drawn that those costs cannot be allowed under the terms of the statute providing for fair compensation to the holders of terminated war contracts."

The Board's opinion shows that it reached its reluctant conclusion because it thought it was compelled to do so by the parol evidence rule. We make two observations about this reasoning. First, Section 6 of the Contract Settlement Act, 41 U.S.C.A. § 106, after stating in subsection (d) the items that should be taken into account in arriving at a settlement, says in subsection (g): "Where any war contract does not provide for or provides against such fair compensation for its termination, the contracting agency, either before or after its termination, shall amend such war contract by agreement with the war contractor, or shall authorize, approve, or ratify an amendment of such war contract by the parties thereto, to provide for such fair compensation."

This provision shows, we think, that the statutory plan for the settlement of termination claims for war contracts ought not to be defeated by a rigorous application of the parol evidence rule. Second, we think the parol evidence rule was not properly applicable. As we have said, the general assumption of those at the January 27 conference was that the plaintiff would be treated as if all the work had been done under one continuing subcontract. If he is so treated, that does not contradict or vary anything written into the February 6 proposal by Lights, which the plaintiff accepted. The Government points to item 7 of the

proposal which said: "Lights, Incorporated, to assume no responsibility for your past commitments or debts." We think this language meant only what it said. The plaintiff's claim here is not that Lights became liable for his debts or commitments. His claim is that, under the statutory scheme for the settlement of terminated war contracts, he is entitled to be reimbursed for his expenditures made in preparation for performance of a war contract.

Soderberg, the representative of Lights at the January 27 conference, testified that he gave no thought at that time to the question of a termination by the Government for its convenience before the plaintiff's subcontract would be performed. He anticipated that the plaintiff would get his reimbursement for his starting costs by being paid for all work covered by his new subcontracts. The question of termination allowances was, however, not the problem of Lights. It was the problem of the Government. Section 6 (a) of the Contract Settlement Act provides: "Such fair compensation for the termination of subcontracts shall be based on the same principles as compensation for the termination of prime contracts."

The effect of this statute is that the law and the policy of the statute, and not ordinary contract law should govern such settlements. The representatives of the Government assured the plaintiff that, for termination purposes, his former sub-subcontract and his new subcontracts would be treated as one transaction.

■ The Appeal Board of the Office of Contract Settlement found that the plaintiff "was unquestionably led to believe in good faith" that they would be so treated. The Appeal Board, in addition to being troubled by the parol evidence rule, as we have seen, said that the Government agents present at the conference were not contracting officers. But they were the persons directed by the Government to attend the conference and speak for the Government, and, so far as the plaintiff was concerned, they were the Government. Section 117 of the Contract Settlement Act provides that the Government shall be bound when a con-

tractor or subcontractor relies in good faith upon the apparent authority of an agent of the Government and acts pursuant to the agent's request. In this case the plaintiff, as a part of the January 27 arrangement, consented to the cancellation of the then existing subcontract "for cause" although the delay in performing it was due to changes made by the Government in the specifications. He thereby gave up valuable rights, substantially the same as what he sues for here. Further, in reliance upon the representations, he entered into the new subcontract which he proceeded to perform diligently. It would be unfair to permit the Government to repudiate the representations of its agents, and we think the law does not permit it to do so.

Sections 4 (b), 6, 12, and 20 (d) of the Contract Settlement Act, 41 U.S.C.A. §§ 104 (b), 106, 112, 120 (d), authorize the Director of the Office of Contract Settlement to issue Regulations. Regulation No. 6, dated September 30, 1944, 9 Fed.Reg. 12282 defines "fair compensation". One of its paragraphs is as follows: "(f) Loss on facilities—conditions on allowance. In the case of any special facility acquired by the contractor solely for the performance of the contract, or the contract and other war-production contracts, if upon termination of the contract such facility is not reasonably capable of use in the other business of the contractor having regard to the then condition and location of such facility, an amount which bears the same proportion to the loss of useful value as the deliveries not made under the contract bear to the total of the deliveries which have been made and would have been made had the contract and the other contracts been completed, * * *."

This language, together with the statutory provision quoted above which says that fair compensation for subcontractors shall be based upon the same principles as for prime contractors, would have been directly applicable to the plaintiff, except for the fact that he had his "other" war subcontract, not as an individual, but as a member of the partnership of Dix & Dee, which, in turn subcontracted the work to

him. He, however, was the one who did the work and incurred the "starting cost" expense. We think that this rather slight deviation from the situation described in the Regulation was fully compensated by the assurances given the plaintiff by the Government's agents, on the basis of which assurances the plaintiff surrendered valuable rights and undertook new obligations.

The plaintiff is entitled to recover the principal sum of $49,880.85 with interest at 2½% on that sum from June 18, 1945, until payment.

It is so ordered.

JONES, Chief Judge, and HOWELL, WHITAKER, and LITTLETON, Judges, concur.